IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Andrew R. Perrong<br>1657 The Fairway #131<br>Jenkintown, PA 19046<br><br>      Plaintiff<br><br>vs.<br><br>Viasat, Inc.<br>1209 Orange St.<br>Wilmington, DE 19801,<br><br>The REI Network LLC<br>d/b/a The Most Reliable<br>1242 Dunbridge St.<br>Apopka, FL 32703<br><br>      Defendants.<br><br>*And Related Crossclaim* | Case No. 2:21-cv-05393-ER<br><br>JURY TRIAL DEMANDED |

### **AMENDED COMPLAINT**

### **Preliminary Statement**

1. As the Supreme Court recently explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. . . . For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr v. Am. Ass'n of Pol. Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

2. Plaintiff Andrew R. Perrong ("Plaintiff"), brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance calling practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

1

3.  The Plaintiff never consented to receive the calls, which were placed to him for telemarketing purposes.

## Parties

4.  Plaintiff Andrew R. Perrong is a Pennsylvania resident, and a resident of this District.

5.  Defendant Viasat, Inc. is a Delaware corporation headquartered in Carlsbad, California. Its address for service of process is 1209 Orange St. Wilmington, DE 19801. Defendant Viasat, Inc. provides satellite internet services within this District.

6.  Defendant The REI Network LLC, d/b/a The Most Reliable (incorrectly identified by Defendant Viasat as The R.E.I. Network LLC) is a Florida LLC with a registered agent address at 924 N Magnolia Avenue, Suite 202, PMB 1262, Orlando, FL 32803. However, Defendant Viasat, Inc. has alleged an alternative address for Defendant at 1242 Dunbridge St. Apopka, FL 32703.

7.  The Defendants engaged in calling activity into this District, as they did with the Plaintiff.

## Jurisdiction & Venue

8.  The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Fin. Services, LLC*, 132 S. Ct. 740 (2012).

9.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the automated calls and text messages to the Plaintiff were placed into this District.

**The Telephone Consumer Protection Act**

10.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the automated calling industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The TCPA Prohibits all Automated Calls To Protected Numbers

11.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." *See* 47 U.S.C. § 227(b)(1)(A)(iii).

12.     Congress singled out these services for special protection either because Congress realized their special importance in terms of consumer privacy and therefore protected them (as in the case of cellular phones), or because the numbers are assigned to services, like Mr. Perrong's VoIP service, for which the called party is charged, thus shifting the cost of automated or prerecorded telephone calls onto consumers. *See Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S. Ct. 2335, 2363, (2020) (Gorsuch, J. & Thomas, J., concurring in part and dissenting in part).

13.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a

greater nuisance and invasion of privacy than live calls, and such calls can be costly and inconvenient.

14. The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

15. This cause of action applies to users of any one of the four protected services (pager, cellular, specialized mobile radio [i.e. radiotelephony locator beacons or dispatch systems], or another radio common carrier service [i.e. ship-to-shore or air-to-ground]), or *any* service, including residential, VoIP, and landline services, for which the called party is charged for the call. *See Perrong v. Victory Phones LLC*, No. 20-5317 (E.D. Pa. July 15, 2021).

The Growing Problem of Automated Telemarketing

16. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls*, FCC, (July 22, 2016, 10:30 AM), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls [https://archive.is/w2afC] (statement of FCC chairman).

17. "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016), https://www.ftc.gov/system/files/documents/advocacy_documents/commentstaff-ftc-bureau-consumer-protection-federal-communications-commission-rulesregulations/160616robocallscomment.pdf.

18. In fiscal year 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. Fed. Trade Comm'n, *FTC Releases FY 2017 National Do Not*

4

*Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc [https://archive.is/oPZSW].

19. *The New York Times* recently reported on the skyrocketing number of robocall complaints and widespread outrage about illegal telemarketing. Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html [https://archive.is/mS9Fb]; *see also* Katherine Bindley, *Why Are There So Many Robocalls? Here's What You Can Do About Them*, Wall St. J. (July 4, 2018, 10:30 PM), https://www.wsj.com/articles/why-there-are-so-many-robocalls-heres-what-you-can-do-about-them-1530610203 [https://archive.is/V2UYp].

20. Industry data shows that the number of robocalls made each month increased from 831 million in September 2015 to 4.7 billion in December 2018—a 466% increase in three years. *U.S. Endures 4.7 Billion Robocalls in July, According to YouMail Robocall Index*, YouMail (Aug. 6, 2019, 9:00 AM), https://www.prnewswire.com/news-releases/us-endures-4-7-billion-robocalls-in-july-according-to-youmail-robocall-index-300895976.html [https://archive.is/pnU5s].

21. According to online robocall tracking service "YouMail," 5.6 billion robocalls were placed in October 2019 at a rate of approximately 180.6 million per day. *Robocall Index*, YouMail, https://robocallindex.com/ [https://archive.is/fwZD8]. In 2019, YouMail's robocall totals exceeded 58.5 billion. *Historical Robocalls By Time*, YouMail, https://robocallindex.com/history/time [https://archive.is/XWefY].

22. The FCC also has received an increasing number of complaints about unwanted calls, with 150,000 complaints in 2016, 185,000 complaints in 2017, and 232,000 complaints in 2018. *Consumer Complaint Data Center*, FCC, www.fcc.gov/consumer-help-center-data [https://archive.is/wip/ojuBF].

The National Do Not Call Registry

23. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

24. A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

25. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers whose numbers are on the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

**Factual Allegations**

26. Defendant Viasat is in the business of operating and selling, *inter alia*, residential satellite internet services.

27. Viasat's business model relies on hiring third party marketing companies to contact customers who have internet services from different providers and convincing them to switch their internet services to Viasat.

28. To solicit sales for its services, Defendant Viasat relies on marketing vendors, such as Defendant The Most Reliable, to "market and solicit orders for Viasat Services."

29. Viasat hired The Most Reliable to generate orders for Viasat.

30. Defendant The Most Reliable, with the knowledge and acceptance of Viasat, used automated telemarketing calls to solicit potential customers for Viasat.

31. In fact, Viasat authorized The Most Reliable representatives to identify themselves as from "Viasat," sell "Viasat" services, and claim they were calling from "Viasat."

32. Neither Defendant is registered as a telemarketer with the Attorney General of Pennsylvania.

33. One of the strategies used by the Defendant The Most Reliable involves the use of automated telephone calls and text messages. Defendant The Most Reliable sends out these call and message blasts *en masse* to telephone numbers throughout the area, hoping they reach someone interested in purchasing Viasat services.

34. Plaintiff Perrong is a "person" as defined by 47 U.S.C. § 153(39).

35. Plaintiff has private telephone numbers of (215) 208-XXXX and (215) 947-XXXX.

36. The (215) 208-XXXX number is a cellular telephone number.

37. The Plaintiff is charged for each call placed to the (215) 947-XXXX number.

38. The numbers are not associated with any business.

39. The Plaintiff registered the numbers on both the Federal and Pennsylvania State Do-Not-Call registries, was on such registries for more than thirty-one days prior to the calls, and never removed the numbers from these registries.

40. The numbers are used for Plaintiff's personal residential use.

41. The Plaintiff did not consent to receive the calls/messages complained of herein to his numbers.

42. Between November 4, 2021 and December 6, 2021, in total, Defendant The Most Reliable and/or other agents of Viasat sent at least 4 calls using an Automatic Telephone Dialing System ("ATDS"), 1 manually dialed marketing call, 6 text messages sent using either an ATDS or pre-programmed means, and 1 manually generated text message to the (215) 208-XXXX number to offer the Plaintiff Viasat services.

43. On November 4, 2021, Defendant The Most Reliable placed at least one call using an ATDS to the (215) 947-XXXX number to offer the Plaintiff Viasat services.

44. The calls and text messages came from various caller IDs, including 215-349-3114, 215-814-6254, 330-892-7837, 215-642-6132, 737-207-9691, 630-908-5485, and 610-931-5807.

45. The initial calls all followed a substantively identical pattern. The calls Plaintiff received all stated that the caller was calling from some variation of "Telecommunications." The callers were calling to pitch the Plaintiff on an internet service with a number of benefits and all spoke from the same or similar script, presumably written by either Viasat or The Most Reliable.

46. Because of the caller's use of a generic name, Plaintiff knew that it would not be easy, or potentially impossible, to identify the caller without scheduling an installation. Accordingly, Plaintiff scheduled an installation and provided unique information, including credit card number and e-mail address on November 8, 2021.

47. Plaintiff received a charge on his credit card directly from Viasat shortly after the telephone call from The Most Reliable.

48. The fact that the charge came from Viasat shows that The Most Reliable has the ability to directly enter orders into Viasat's internal systems and charge for them.

8

49. Furthermore, the Plaintiff received emails directly from Defendant Viasat to the unique e-mail address he provided on the call confirming the installation and providing an account number on November 9, 2021.

50. All the initial calls began with a "balloon popping" sound. This sound is indicative of the ViciDial ATDS and is officially known as the "droplet" sound. It is played automatically as part of a macro when the Asterisk "meetme" application is executed and signifies that a new connection was established between the called party and a call center representative that the called party had not previously spoken to.

51. Additionally, two of the calls that came on November 8, 2021 from the caller ID 737-207-9691, came within seconds of each other and rang the Plaintiff's cell phone simultaneously before the Plaintiff even had the opportunity to answer the first call.

52. As the Supreme Court recently clarified, the key feature of an ATDS is the capacity to store numbers to be called using a random or sequential number generator or to produce numbers to be called using a random or sequential number generator. *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021). ViciDial is an ATDS because it has the capacity to store numbers both randomly and sequentially.

53. Furthermore, the indicia of the calls indicate that the Defendants used an ATDS because it would be illogical to store numbers or produce numbers in an *en masse*, unpersonalized calling campaign other than randomly or sequentially, such as by a human dialing the number manually. ATDS systems also exhibit strange behavior not typically associated with manually dialed calls, such as placing multiple calls simultaneously and then hanging up. The fact that the calls were not at all personalized, exhibited this strange behavior, and came at random dates and times further supports the inference that the Defendants used an

ATDS, such as one which "use[s] a random [or sequential] number generator to determine the order in which to pick phone numbers from a preproduced list." *Id.* at 1171 n.7.

54. The caller ID numbers which were used for the initial calls also were "spoofed" to appear to be random calls from local residents. The caller IDs Plaintiff received the calls from further support the fact that the system Defendant The Most Reliable used had the capacity to store or produce telephone numbers to be called randomly therefore renders it an ATDS, as they were manipulated to appear to be calls from local residents. It follows that if the dialer has the capacity to store or produce random numbers to transmit a caller ID, it also has the capacity to store or produce random telephone numbers to be dialed, especially because the equipment needed to manipulate a caller ID to display a random number is far more sophisticated than the equipment needed to place a call to a random telephone number.

55. After the preliminary calls which resulted in an appointment being scheduled and Viasat being affirmatively identified, the Plaintiff requested, in writing, that Defendant Viasat place him on its Do-Not-Call list and provide him a copy of its Do-Not-Call policy, on November 9, 2021.

56. Plaintiff only received a response from Colin Ward, Viasat's Chief Litigation Counsel, requesting an extension of time to respond to the complaint after the complaint was filed. Mr. Ward did not provide the Plaintiff a copy of Viasat's Do Not Call policy or place Plaintiff on Viasat's Do Not Call list, *to this day*.

57. The calls and text messages continued despite making clear to Viasat that they were unwanted. Plaintiff received 3 text messages and a call to the (215) 208-XXXX number after November 9, 2021. To make matters worse, these communications appear to have been placed directly by Viasat and not Defendant The Most Reliable.

58.     Because Plaintiff asked to be placed on Defendant Viasat's Do-Not-Call list and was not, it is evident that Defendant Viasat, let alone Defendant The Most Reliable, does not maintain such a list. Likewise, based on this fact and the fact that it did not produce one when requested, it is clear that neither Defendant Viasat nor Defendant The Most Reliable have any Do-Not-Call policies or procedures in place. Based on the nature of their illegal activities, Defendants' noncompliance with the law in this regard is unsurprising.

59.     The Plaintiff is ignorant of the exact process by which the system(s) used by the Defendants operate other than drawing the reasonable inference and making the allegation that it was ViciDial and that it stores or produces telephone numbers randomly or sequentially based on the facts ascertainable from the calls he received, as outlined above. Indeed, as at least one district court explained, "The newly clarified definition of an ATDS is more relevant to a summary judgment motion than at the pleading stage. *Gross v. GG Homes, Inc.*, No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021); *accord Miles v. Medicredit, Inc.*, No. 4:20-cv-01186-JAR, 2021 WL 2949565 (E.D. Mo. July 14, 2021).

60.     The Plaintiff never provided his consent or requested these calls.

61.     The Plaintiff was charged for the calls to the (215) 947-XXXX number.

62.     The communications received by Plaintiff demonstrate that the messages were sent for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services as they pitched satellite internet services. The messages therefore qualified as telemarketing. *See* 47 C.F.R. § 64.1200(f)(12).

63.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." See *In re Rules &*

*Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

64. In their January 4, 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

65. On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers such as Viasat may not avoid liability by outsourcing their marketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted)

66. More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer (unlike here, where Viasat has alleged a contractual relationship), a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 (¶ 34).

67. The May 2013 FCC Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107.

68. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*Id.* at 6592 (¶ 46).

69. Viasat is legally responsible for ensuring that The Most Reliable complied with the TCPA, even if Viasat itself did not itself make the calls.

70. Viasat knowingly and actively accepted business that originated through the illegal telemarketing calls from The Most Reliable.

71. By hiring a company to make calls on its behalf, Viasat "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency.

72. Similarly, by accepting these contacts and by directly entering orders into Viasat systems, The Most Reliable "manifest[ed] assent or otherwise consent[ed] . . . to act" on behalf of Viasat, as described in the Restatement (Third) of Agency. As such, The Most Reliable is an agent of Viasat.

73. Moreover, Viasat maintained interim control over The Most Reliable's actions.

74. For example, upon information and belief, Viasat had absolute control over whether, and under what circumstances, it could allow The Most Reliable to sell Viasat services to a prospective customer or take over their internet needs.

75. Upon information and belief, Viasat also gave interim instructions to The Most Reliable by providing geographic parameters for potential customers, allowed The Most Reliable to directly enter orders into its systems, controlled the volume of leads/sales it would purchase and pay for, and imposed performance and sales metrics on The Most Reliable.

76. As a result, Viasat not only controlled the result of the work, but also the means by which it was accomplished though interim instructions.

77. In fact, The Most Reliable was not explicitly named in the Plaintiff's original complaint because they simply identified themselves as calling on behalf of or in affiliation with Viasat.

78. Plaintiff was harmed by these calls. He was temporarily deprived of legitimate use of his phone because his phone line was tied up during the calls and his privacy was improperly invaded. The Plaintiff was charged for some of the calls. They wasted network resources, bandwidth, power, and battery life. Moreover, these calls injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiff.

## **Legal Claims**

### Count One:
### Violation of the TCPA's Prohibition Against Calling Numbers for Which the Called Party is Charged with an Artificial or Prerecorded Voice

79. By placing at least eleven calls to the Plaintiff using both a ATDS and/or artificial or prerecorded text messages, Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii).

80. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute at least eleven violations of the TCPA, 47 U.S.C. § 227(b), by making calls, except for emergency purposes, to the telephone lines of Plaintiff using an ATDS or using artificial or prerecorded text messages to a cellular telephone number or number for which the called party is charged for the calls.

81. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on their behalf's violations of the TCPA, 47 U.S.C. § 227(b), Plaintiff is entitled to an award of $500 in damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

82. Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on their behalf from violating these provisions in 47 U.S.C. § 227(b) in the future.

83. The Defendants' violations were knowing and/or willful. Accordingly, the Plaintiff seeks up to treble damages of the $500 per violation award, as provided in 47 U.S.C. § 227(b)(3)(B).

## Count Two:
## Violation of the Pennsylvania Telemarketer Registration Act
### 73 Pa. Cons. Stat. § 2241

84. By placing at least thirteen telemarketing calls to the Plaintiff without registering as telemarketers under Pennsylvania law, Defendants violated 73 Pa. Cons. Stat. § 2243. Moreover, by failing to identify themselves in the messages, Defendants violated 73 Pa. Cons. Stat. § 2245.1.

85. This constitutes thirteen violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. 73 Pa. Cons. Stat. § 2246(a).

86. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the Pennsylvania Telemarketer Registration Act (PTRA), 73 Pa. Cons. Stat. § 2241, including by making calls to Plaintiff's number, on the Pennsylvania Do-Not-Call registry, without registration.

87. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on their behalf's violations of the PTRA, 73 Pa. Cons. Stat. § 2241, Plaintiff is entitled to an award of $300 in damages for each and every call made to his telephone number in violation of the statute, pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201. *See* 73 Pa. Cons. Stat. § 2246(a).

88. Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on their behalf from violating the PTRA in the future.

### Count Three:
### Violation of the TCPA's Implementing Regulations
### Codified at 47 C.F.R. § 64.1200

89. By placing at least thirteen telemarketing calls to the Plaintiff, whose number is on the Do-Not-Call registry, failing to have a written Do-Not-Call policy, and failing to maintain the Plaintiff on their Do-Not-Call list, Defendants, jointly and severally, violated 47 U.S.C. § 227(c)(5) by violating the implementing regulations codified in 47 C.F.R. § 64.1200(c) and (d).

90. This amounts to thirty-nine violations since Defendants committed three violations per call. The first violation is calling a number on the national Do-Not-Call registry.

47 C.F.R. § 64.1200(c)(2). The second violation is by calling Plaintiff without having a Do-Not-Call policy in place. 47 C.F.R. § 64.1200(d)(1). The third violation is by calling Plaintiff without maintaining the Plaintiff on their internal Do-Not-Call list. 47 C.F.R. § 64.1200(d)(6).

91. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute at least thirty-nine violations of the TCPA, 47 U.S.C. § 227(c), codified at 47 C.F.R. § 64.1200, by, *inter alia*, refusing to scrub against the National Do-Not-Call registry, refusing to maintain Mr. Perrong's number on an internal Do-Not-Call list, and failing to have a Do-Not-Call policy.

92. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on their behalf's violations of the TCPA, 47 U.S.C. § 227(c), Plaintiff is entitled to an award of $500 in damages for each and every call and violation made to his telephone number in violation of the TCPA's implementing regulations codified at 47 C.F.R. § 64.1200, pursuant to 47 U.S.C. § 227(c)(5)(B).

93. Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on their behalf from violating the TCPA, 47 U.S.C. § 227(c), by making calls in violation of any of the TCPA's implementing regulations in the future.

94. The Defendants' violations were knowing and/or willful. Accordingly, the Plaintiff seeks up to treble damages of the $500 per violation award, as provided in 47 U.S.C. § 227(b)(3)(B).

**Relief Sought**

WHEREFORE, Plaintiff requests the following relief:

    a.    Injunctive relief prohibiting Defendants from calling telephone numbers

using an ATDS, making calls using an artificial or prerecorded voice, and/or in violation of the PTRA, and/or in violation of the TCPA's implementing regulations.

      b.      Because of Defendants' violations of the TCPA's restrictions in 47 U.S.C. § 227(b), Plaintiff Perrong seeks for himself $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3).

      c.      Because of Defendants' violations of the PTRA, Plaintiff Perrong seeks for himself $300 in damages for each violation, pursuant to 73 Pa. Cons. Stat. § 201-9.2(a).

      d.      Because of Defendants' violations of the TCPA's implementing regulations, Plaintiff Perrong seeks for himself $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(c)(5).

      e.      Such other relief as the Court deems just and proper.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

Dated: **June 4, 2022**

_____/s/_____
Andrew R. Perrong
*Plaintiff Pro-Se*
1657 The Fairway #131
Jenkintown, PA 19046
Phone: 215-791-6957
Facsimile: 888-329-0305
andyperrong@gmail.com